**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                                                                                No. 07-CR-1173 JC

KELLY GRANT MERCER,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

THIS MATTER came before the Court on the *United States' Motion in Limine to Exclude the Defense of Necessity/Justification*, filed July 30, 2008 (*Doc. 55*)("Motion"). This case went to trial on October 15, 2008 through October 16, 2008, at which time the jury returned a guilty verdict on the sole count against Defendant Mercer, that being unlawful possession of a firearm by a felon. The issue for resolution on the government's Motion at trial[1] was whether the evidence Mercer presented was sufficient to support a jury instruction on the affirmative defense of justification or necessity. I considered the government's Motion, the relevant authority, and the trial evidence. At the close of evidence, I ruled that the justification/necessity defense could not be presented to the jury for lack of sufficient supporting evidence on at least one of its requisite elements. This Memorandum Opinion follows.

---

[1]The government filed its Motion *in limine*, initially requesting pre-trial exclusion of the necessity defense. The Court set the Motion for hearing, at which time the government's attorney contacted Chambers staff by telephone and indicated that the parties agreed the issue should be reserved for ruling until the time of settling jury instructions. Accordingly, the Court considered the request for *pre-trial* determination withdrawn and proceeded to hear the evidence at trial before ruling.

**I.     Background**

The facts in this matter are chiefly undisputed and, where necessary, are viewed favorably to Mercer's necessity defense. In August of 2000, Defendant Mercer was incarcerated in the Bernalillo County Detention Center. At the time, he was a member of the Syndicato Nuevo Mexico (SNM), a gang operating primarily within the prison system. Among other SNM members housed with Defendant was ranking SNM leader Gerald "Stix" Archuleta. On August 27, 2000, several SNM gang members murdered a fellow inmate named Matthew Cavalier in his prison cell at Archuleta's direction. Cavalier was murdered for being a "snitch." Mercer served as a lookout while other SNM members strangled Cavalier and he then cleaned Cavalier's cell to dispose of evidence after the murder. Mercer knew the identity of the other SNM members involved in plotting and executing Cavalier's murder, including ringleader Archuleta.

Eventually agreeing to cooperate with the authorities in their murder investigation, Mercer plead guilty to tampering with evidence and in return received a sentence of three (3) years' probation. Archuleta was indicted for first degree murder. Mercer was identified by name on the state's witness list in its case against Archuleta, though Mercer never testified because Archuleta eventually plead guilty to conspiracy to commit second degree murder and received a stipulated sentence of four (4) years' imprisonment.

Mercer was under the supervision of the New Mexico Probation Department from 2000 until 2007, when he was arrested in the instant offense. Mercer was also enrolled at the Albuquerque Treatment Center at 209 San Mateo, NE where he received methadone treatment weekly. The clinic was located a few blocks from Mercer's apartment.

On August 7, 2006, Mercer's probation officer, Stephen Weinstein, received information from the New Mexico Department of Corrections indicating that there was an active "hit" out on Mercer's life from the SNM gang.  Consequently, some probation officers began taking armed officers with them when they visited Mercer, as reflected by a notation in Mercer's file stating "this office will complete field calls with an armed officer from here on out for security reasons." *Defendant's Trial Ex. H*. Weinstein advised Mercer by phone of the threatening situation and warned him again on August 15, 2006, advising that Mercer "must be very careful, as there is new, credible info. that there is a hit out on his [Mercer's] life." *Id.*  From August 2006 through March of 2007, some probation officers continued to bring armed officers along when making home visits to Mercer.

On or about March 23, 2008, Mercer's then-girlfriend Jennifer Barler was approached by a man she did not know outside the apartment she shared with Mercer.  Barler was instructed by the stranger to "tell [Mercer] that his homey from the County [was] looking for him."  Barler relayed the message to Mercer.

On Saturday, March 24, 2007, Mercer went to the clinic to get his regular methadone treatment at the Albuquerque Treatment Center but could not access the clinic because it was taped off as a crime scene.  No further explanation was given to Mercer at that time.  The clinic is always closed on Sunday, so Mercer returned for his methadone on Monday, March 26, 2007, at which time he learned that there had been a shooting at the clinic the previous Saturday.

On Tuesday, March 27, 2008, Mercer learned for the first time that Gerald Archuleta was being pursued by police as the main suspect in the clinic shooting.  This information, combined with the message Mercer's girlfriend had relayed from the stranger, led Mercer to believe that

Gerald Archuleta had been released from prison early and was trying to kill him. Mercer went to his brother's house and procured the (unloaded) gun that formed the basis of the charge and conviction in this case. Mercer intended to acquire ammunition for the firearm at some point in the future and to use the weapon to protect himself and his girlfriend against Archuleta.

Later the same day, Tuesday March 27, 2007, New Mexico Probation and Parole Officers (PPOs) were conducting surveillance in the area of Kathryn and Madeira in Albuquerque when they observed a man they recognized as Mercer walking into an apartment at 1001 Madeira SE. PPO Cleland ran a query through the New Mexico Department of Corrections (DOC) database and confirmed that Mercer was still under supervision. A little while later, Cleland saw Mercer and another man (Mercer's brother) exit the apartment and walk toward a blue Chevrolet truck matching the description of a vehicle listed for Mercer in the DOC database. Cleland observed that Mercer was holding an object wrapped in a white cloth. Cleland made contact with Mercer and Mercer's brother and noticed the barrel of a firearm sticking out of the white cloth that had been placed on the seat of the truck. Mercer was arrested for being found in possession of the firearm. Upon arrest, Mercer talked to ATF Agent Danny Garcia, explaining that he possessed the firearm to protect himself from Gerald Archuleta, who was out of prison and whom he believed was trying to murder him. Mercer stated at that time that his decision to get the firearm was "stupid." At trial, Mercer acknowledged that he was, indeed, in possession of the firearm after being convicted of a felony.

## II.     Discussion

### A.     The Law on Necessity Defense

To obtain a conviction under § 922(g)(1), the government must prove beyond a

reasonable doubt that (1) the defendant was previously convicted of a felony; (2) defendant thereafter knowingly possessed a firearm, and (3) the defendant's possession of the firearm was in and affecting interstate commerce. *See United States v. Baker*, 508 F.3d 1321, 1324 (10th Cir. 2007). The Tenth Circuit has described federal firearms laws as imposing "something approaching absolute liability." *United States v. Adkins*, 196 F.3d 1112, 1115 (10th Cir. 1999) (quotation omitted). Notwithstanding this strict approach, the Tenth Circuit has also recognized the availability of a common law necessity defense in certain, narrow circumstances. *United States v. Al-Rekabi*, 454 F.3d 1113, 1121-22 (10th Cir. 2006). The defense may be raised only if a defendant can show each of the following elements:  (1) there was an unlawful and present, imminent and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury; (2) the defendant had not recklessly or negligently placed himself in a situation in which it was probable that he would be forced to choose the criminal conduct; (3) there was no reasonable, legal alternative to violating the law, a chance to both refuse to do the criminal act and also to avoid the threatened harm; and (4) a direct, causal relationship may be reasonably anticipated between the criminal action taken and the avoidance of the threatened harm. *United States v. Butler*, 485 F.3d 569, 572 (10th Cir. 2007).

     The defense of necessity "does not negate a defendant's criminal state of mind when the applicable offense requires a defendant to have acted knowingly or willfully; instead, it allows the defendant to 'avoid liability . . . because coercive conditions or necessity negates a conclusion of guilt even though the necessary *mens rea* was present.'" *Dixon v. United States*, 126 S. Ct. 2437, 2442 (2006)(quoting *United States v. Bailey*, 100 S. Ct. 624 (1980))(ellipses in original). Necessity "'does not arise from a 'choice' of several courses of action . . . . It can be

5

Case 1:07-cr-01173-JB   Document 93   Filed 11/04/08   Page 6 of 9

asserted only by a defendant who was confronted with . . . a crisis which did not permit a selection from among several solutions, some of which did not involve criminal acts.'" *Turner*, 44 F.3d at 902 (quoting *United States v. Seward*, 687 F.2d 1270, 1276 (10th Cir. 1982)). *See also United States v. Bailey*, 444 U.S. 394, 409-10 (1980)(necessity described as a "choice of evils" defense, applicable where "forces beyond the actor's control rendered illegal conduct [such as otherwise unlawful possession of a firearm] the lesser of two evils."); *United States v. Vigil*, 743 F.2d 751, 756 (10th Cir. 1984) (to raise necessity defense, defendant must establish he faced "an unlawful and present, imminent, and impending [threat] of such a nature as to induce a well-grounded apprehension of death or serious bodily injury") (internal quotations omitted); *United States v. Lewis*, 628 F.2d 1276, 1279 (10th Cir. 1980) (defense of necessity is "based on a real emergency" and can be asserted "only by a defendant who was confronted with a crisis as a personal danger").

The Tenth Circuit cautions that "the necessity exception [to something approaching strict liability] should be strictly and parsimoniously applied." *Al-Rekabi* 454 F.3d 1122. While the jury must find all four elements beyond a reasonable doubt for the affirmative defense of necessity to be successful, a less burdensome "some evidence" standard applies in determining entitlement to a jury charge on the defense. *Al Rekabi* at 1121. Ultimately, the defendant bears the burden of establishing a necessity defense by a preponderance of the evidence and the government is not required to disprove it. *Dixon*, 126 S. Ct. at 2422-43.

**B.   <u>Analysis</u>**

At the close of evidence, the government challenged the sufficiency of Mercer's evidence that (1) the threat of harm was sufficiently imminent; and (2) that Mercer had no reasonable

6

alternative to unlawfully possessing the firearm. Indeed, the purpose of requiring a defendant to show that he had no legal alternative to violating the law is "to force an actor to evaluate the various options presented and choose the best one," for the presumption is that "[i]n most cases, there will be a clear legal alternative." *Al-Rekabi* at 1123. As the Supreme Court articulated in *Bailey*, a necessity defense is available where a defendant demonstrates that "given the imminence of the threat, violation of [the law] was his only reasonable alternative." 444 U.S. at 411. It is in this regard that Defendant Mercer fell short. By his own testimony on cross examination, Defendant chose the unlawful alternative of possessing a firearm from among several choices, most of which did not involve a criminal act. Specifically, Mercer testified as follows:

> Q: And you discuss it and you say: Brother, you know, I thought maybe I can call Crime Stoppers?
> A: Uh-huh.
> Q: But you decide not to?
> A: Uh-huh.
> Q: And in fact, you don't call the police?
> A: No, Sir, I didn't.
> Q: And you could have?
> A: Yes.
> Q: You could have said: Police, look, I feel that I'm in danger from this guy, this Gerald Archuleta?
> A: Uh-huh.
> Q: And he's out on the streets, shooting people, and you know what, could you give me protection? Could you have done that?
> A: I could have. But like I say, when I testified in 2000 or gave statements in 2000, there wasn't much of anything like that. I mean, they recommended I leave. But as far as personal protection, I didn't really see any of that.
> Q: But you didn't try. Could you have tried?
> A: In 2007? Yes.
> Q: That's right?
> A: Yes.
> Q: You could have tried?
> A: Yes.
> Q: But you didn't take that. You didn't call the police and say: Police, could you

|     |     |
| --- | --- |
|     | start patrolling the area where I live and make sure that this guy that you are looking for, well – you can assume they were looking for Gerald Archuleta, is that correct? |
| A:  | Yes. |
| Q:  | Because he had been involved in the shooting? |
| A:  | Yes. |
| Q:  | So you could have said: Well, police, could you patrol the area around my apartment and make sure that this guy is not around? |
| A:  | Yes, I could have done it. |
| Q:  | And so then you go down to see your brother and you discussed – did you discuss the firearm? |
| A:  | With my brother? Yes. |

Draft Trial Transcript at 1-18 (taken on October 14, 2008)(Mercer).[2]

Defendant's own testimony, therefore, sheds intense doubt on whether the threat could be considered imminent for purposes of the affirmative defense. Elemental to my determination at trial, however, was that even assuming I found sufficient evidence on the requisite imminence, the threat was not *immediate*, making it feasible for Mercer to have considered all of his options and pursued a lawful one. The lack of immediacy is clear from Mercer's testimony indicating that the unloaded gun was of no use to him without bullets, which he intended to get in some unspecified way, at some later time. Further, testimony established that Mercer left his girlfriend alone in the truck while he went inside to get the gun, leaving vulnerable the very person he claimed he wanted to protect. Urgency, then, was not present. Mercer readily acknowledged that he could have sought police protection but did not. Testimony from PO Wendy Elmhauser established that emergency travel permits are available for probation supervisees, but Mercer did not request one. Mercer dismissed as futile the notion of going to the authorities for protection or seeking permission to travel to a safer place until Archuleta was apprehended. Yet

---

[2] The Court's citations to the transcript of the testimony refer to the Court Reporter's original, unedited version. Any final transcript may contain different page and/or line numbers.

the law requires a defendant asserting a justification defense to choose a lawful alternative where one exists.

## IV.     Conclusion

Because the evidence clearly established that Mercer had both lawful alternatives and time to pursue them, I determined that Mercer failed in his evidentiary burden to show "some evidence" on each of the requisite elements of his affirmative defense. Accordingly, I ruled that the jury would not be instructed on the justification/necessity defense.

Dated November 4, 2008.

s/John Edwards Conway

_____
SENIOR UNITED STATES DISTRICT JUDGE

Attorney for Plaintiff:

    Rumaldo Armijo, AUSA
    Albuquerque, New Mexico

Attorney for Defendant:

    Richard Winterbottom, AFPD
    Albuquerque, New Mexico